IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Berkline/BenchCraft Holdings, LLC, *et al.*,[1] | Case No. 11-11369 (_____) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF KEITH COOPER
## IN SUPPORT OF FIRST DAY MOTIONS

Keith Cooper, being duly sworn, deposes and says:

1. I am the Chief Restructuring Officer of Berkline/BenchCraft Holdings, LLC ("Holdings"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").[2] I am authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the first day pleadings (the "First Day Motions") described herein.

2. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records. I have also reviewed the First Day Motions and accompanying forms of orders and am familiar with the facts alleged therein and relief requested. Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary course of my responsibilities as Chief Restructuring Officer and, if called as a witness, would testify thereto.[3]

---

[1] The Debtors in these chapter 11 cases are: Berkline/BenchCraft Holdings, LLC, Berkline/BenchCraft, LLC, Berkline, LLC, Blue Mountain Trucking Corporation, BenchCraft, LLC, and BenchCraft International Sourcing, Inc. The mailing address for all of the Debtors is One Berkline Drive, Morristown, TN 37813.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion (defined below).

[3] Certain of the disclosures herein relate to matters within the knowledge of other employees of the Debtors and are based on information provided by them.

## I. GENERAL BACKGROUND

3. The Berkline brand was founded in 1928 in Massachusetts. In 1937, the company's headquarters was moved to Morristown, Tennessee. Until the decision was made to liquidate, the Debtors were a leading North American designer and manufacturer of upholstered and reclining furniture. In particular, the Debtors enjoyed a number five market share and had a growing presence in home theater seating including reclining sofas, love seats, and sectionals. The Debtor's products are sold through regional and national furniture chains, big box stores, department stores, buying exchanges, and internet retailers. The "Berkline" brand focuses on "motion" furniture, such as reclining sofas, love seats, sectionals and home theatre seating. The Debtors ceased production of the "BenchCraft" brand in 2008.

### A. The Bankruptcy Cases

4. As of the date of filing hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief in this Court under chapter 11 of title 11 of the United States Code, §§ 101-1532, as amended (the "Bankruptcy Code").

### B. The Debtors' Corporate Structure

5. The immediate non-debtor parent entities of Holdings, a Delaware limited liability company, are SCSF Furniture (US), LLC and SCSF Furniture Group Holdings, LLC. Holdings wholly owns Berkline/BenchCraft, LLC ("Berkline/BenchCraft"), also a Delaware limited liability company. Berkline/BenchCraft wholly owns: (i) Berkline, LLC ("Berkline"), a Delaware limited liability company, (ii) Blue Mountain Trucking Corporation ("Blue Mountain"), a Mississippi corporation, and (iii) BenchCraft, LLC ("BenchCraft"), a Delaware limited liability company. BenchCraft wholly owns BenchCraft International Sourcing, Inc. ("BenchCraft International"), a Delaware corporation.

## C. The Debtors' Pre-Filing Debt Structure

6. <u>The First Lien Credit Agreement</u>. Each of the Debtors are party to that certain Credit Agreement, dated as of March 19, 2008 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>") by and among Berkline/Benchcraft, Berkline, Blue Mountain, BenchCraft and BenchCraft International, each as a borrower (collectively, the "<u>First Lien Borrowers</u>"), Holdings, as a guarantor, Wells Fargo Foothill, LLC, now known as Wells Fargo Capital Finance, LLC as the US Administrative Agent (in such capacity, the "<u>First Lien Agent</u>") and the US Collateral Agent, the lenders party thereto from time to time (the "<u>First Lien Lenders</u>") and other parties thereto. Under the First Lien Credit Agreement, the First Lien Lenders provided to the First Lien Borrowers: (i) a revolving credit facility in the maximum amount of $44.5 million (the "<u>First Lien Revolver</u>")[4] and (ii) a term loan facility in the maximum amount of $13.5 million (the "<u>First Lien Term Loan</u>" and, collectively with the First Lien Revolver, the "<u>First Lien Facilities</u>"). Amounts outstanding under the First Lien Credit Agreement are secured by a first priority security interest in all or substantially all of the assets of the First Lien Borrowers. The obligations under the First Lien Credit Agreement were also guaranteed by each of Holdings and Berkline, Inc. (Quebec), a non-debtor affiliate of Berkline/BenchCraft and Berkline. As of the Petition Date, approximately $11.1 million (including accrued and unpaid interest) is outstanding under the First Lien Term Loan, and approximately $4.29 million remains outstanding under the First Lien Revolver. Through a series of transactions, SCSF CCFurniture (US), LLC and SCSF CCFurniture, LLC (collectively, "<u>SCSF First Lien Lender</u>"), affiliates of SCSF Furniture (US), LLC and SCSF

---

[4] The actual availability of the First Lien Revolver is based upon a borrowing base formula which includes, among other things, certain eligible accounts receivable and inventory.

Furniture Group Holdings, LLC, acquired a participation interest in approximately $11 million of the First Lien Term Loan.

7. <u>The Second Lien Credit Agreement</u>. Berkline/BenchCraft is party to that certain Amended and Restated Credit and Guaranty Agreement, dated as of May 9, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>") by and among Berkline/Benchcraft, as borrower (in such capacity, the "<u>Second Lien Borrower</u>"), each of Holdings, Berkline, Blue Mountain, BenchCraft and BenchCraft International, as guarantors (collectively, the "<u>Second Lien Guarantors</u>"), Goldman Sachs Credit Partners L.P., as sole bookrunner, sole lead arranger and syndication agent, The Bank of New York Mellon, as successor administrative agent and collateral agent, (in such capacity, the "<u>Second Lien Agent</u>," and together with the First Lien Agent, the "<u>Prepetition Agents</u>"), the lenders party thereto, from time to time (collectively, the "<u>Second Lien Lenders</u>," and together with the First Lien Lenders, the "<u>Prepetition Secured Lenders</u>") and the other parties thereto. Under the Second Lien Credit Agreement, the Second Lien Lenders provided to the Second Lien Borrower, <u>inter alia</u>, (i) a liquidity facility with a maximum commitment of $40 million (the "<u>Second Lien Liquidity Loan</u>"), (ii) a revolving credit facility in the maximum principal amount of $25 million (the "<u>Second Lien Revolver</u>"), and (iii) a term loan facility in the maximum principal amount of $110 million (the "<u>Second Lien Term Loan</u>," together with the Second Lien Revolver and Second Lien Liquidity Loan, the "<u>Second Lien Facilities</u>"). Pursuant to the terms of the Second Lien Credit Agreement, payments of any loans under the Second Lien Facilities will be applied: (i) first, to the Second Lien Liquidity Loans, (ii) second, to any swing line loans, (iii) third, to the Second Lien Revolver, and (iv) fourth, the Second Lien Term Loan.

8. Substantially all of the Second Lien Facilities were acquired by: (i) SCSF Furniture, LLC, (ii) SCSF BBFurniture, LLC, (iii) SCSF BBFurniture (US), LLC, (iv) SCSF Furniture (US), LLC and (v) other entities affiliated with and related to the Debtors. As set forth above, SCSF Furniture (US), LLC, is a non-debtor parent of Holdings, and the other foregoing SCSF entities are affiliates thereof.

9. As of the Petition Date, approximately $140 million (including accrued and unpaid interest) is outstanding under the Second Lien Term Loan, approximately $25.8 million (including accrued and unpaid interest) is outstanding under the Second Lien Revolver, and approximately $28.7 million (including accrued unpaid interest) is outstanding under the Second Lien Liquidity Facility. Pursuant to that certain Subordination and Intercreditor Agreement (the "2008 Intercreditor"), dated as of March 19, 2008, the payment of any and all of the amounts due under the Second Lien Credit Agreement is subordinate to the obligations under the First Lien Credit Agreement. The obligations under the Second Lien Credit Agreement are secured by second priority liens on and security interests in substantially all of the assets of the Debtors.

10. The Unsecured Subordinated Notes. Berkline/BenchCraft entered into an Exchange Agreement, dated as of May 4, 2007 by and among Berkline/Benchcraft, Holdings, Goldman Sachs Credit Partners, L.P., as agent under a then existing credit agreement, and the lenders party thereto, pursuant to which Berkline/BenchCraft issued unsecured subordinated promissory notes to certain lenders in the aggregate principal amount of $10 million (as the same may have been amended, restated, supplemented or otherwise modified from time to time, the "Sub Notes"). As of the Petition Date, approximately $12.5 million (including accrued and unpaid interest) is outstanding under the Sub Notes. The obligations under the Sub Notes are unsecured. As of the Petition Date, all or substantially all of the Sub Notes are owned by: (i)

SCSF Furniture Group Holdings, LLC and (ii) SCSF Furniture (US), LLC, the non-debtor parent entities of Holdings, and (iii) other related entities, all of which may be affiliates of the parent entities.

**D.   Events Leading to the Filing of the Chapter 11 Cases.**

11.   The global economic recession, and the accompanying unprecedented downturn in the national housing market, led to a resulting steep decline in the Debtors' sales. The Debtors' management team has worked aggressively – and successfully – to streamline their operations by reducing expenses and costs, creating efficiencies, and to eliminate underperforming aspects of the business. In fact, in management's view, the Debtors had a potentially healthy business and had a possibility of meeting or exceeding their business plan. However, the Debtors simply have far too much debt, especially in the current economic environment.

12.   Even with the success in reducing their fixed costs, the Debtors have not been able to generate sufficient cash flows to meet their continuing obligations. Since October 2010, the Debtors have pursued alternatives to restructure their obligations, including approaching their existing investors for additional funding. In February 2011 the Debtors engaged the services of FTI as Chief Restructuring Officer. FTI and the Debtors immediately undertook an exhaustive search for a going concern buyer of the Debtors' assets. FTI and the Debtors identified and provided due diligence information to seven potential going concern buyers. FTI and the Debtors engaged in extended negotiations but were unable to reach agreement and secure needed financing on acceptable terms. As a result, the Debtors' efforts at an out-of-court restructuring proved unsuccessful. In late March 2011, after extensive discussions, the Debtors' management and their Boards of Directors, in the exercise of their reasonable business judgment, determined that the most effective way to maximize the value of the Debtors' estates for the benefit of their

creditors was an orderly liquidation of all of the Debtors' assets for the benefit of their creditors. On April 29, 2011, the Debtors' management and their Boards of Directors directed the Debtors to seek protection under chapter 11 of the Bankruptcy Code in furtherance of the orderly liquidation of their assets under the supervision of the Bankruptcy Court.

13. The Boards of Directors have voted to approve a resolution giving authority to file voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

### E. Objectives of the Chapter 11 Filing.

14. Concurrently with the filing of their chapter 11 cases, the Debtors will also be filing a motion seeking authority to implement a process to liquidate or sell substantially all of the Debtors' inventory and related assets (the "Sale Motion"). Prior to the Petition Date, the Debtors and their advisors devoted substantial resources and energy to examining ways in which to restructure the Debtors' obligations to enhance the viability of the business going forward. The Debtors believe that a targeted sale process is most likely to achieve the highest and best price for their assets. Simply stated, since the Debtors do not have sufficient cash resources to continue to operate their business, the value of their assets will continue to decline absent a prompt sale. Therefore, after an extensive prepetition process, the Debtors selected Great American Group as the initial stalking horse bidder (the "Stalking Horse") to purchase substantially all of the Debtors' inventory and related assets and to serve as the agent for a liquidation of such assets for a Guaranteed Minimum cash payment of $2,265,000, together with a sharing of proceeds pursuant to a formula whereby the Debtors will receive 70% of such proceeds. The Stalking Horse's bid was subject to higher and better bids received through a public sale process and an auction. The auction was held on April 26, 2011 and more than a dozen interested parties were given access to information and diligence. At the auction, six (6) different bidders participated and made bids. After more than 18 rounds of bidding, Hilco

Merchant Resources was the winning bidder and the Guaranteed Minimum amount to be paid to the Debtors increased by $451,000 (net of the $65,000 breakup fee and expense reimbursement to Great American) and the sharing percentage payable to the Debtors increased from 70% to 80%.

15. In sum, the inventory auction was extensive, followed a formal process with strict bid procedures, and was extremely successful as evidenced by the large number of bidders at the auction and the significant increase in the price to be paid.

16. With respect to other significant assets, such as real estate and intellectual property, the Debtors have been engaged in a marketing process and will be filing separate motions relating to the proposed sale process after the Creditors Committee has been formed and has had an opportunity to comment.

## II. FIRST DAY MOTIONS

17. Concurrently with the filing of their chapter 11 cases, the Debtors will be filing a number of First Day Motions, a list of which is attached hereto as <u>Exhibit A</u>. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 Cases (the "<u>First Day Hearing</u>"), at which the Court will hear the First Day Motions.

18. As set forth above, the First Day Motions are generally designed to satisfy the following goals: (a) maximize the value of the Debtors' assets and the liquidation thereof, , (b) maintain the confidence and support of customers, employees, suppliers and certain other key constituencies during the orderly liquidation, and (c) establish procedures for the smooth and efficient administration of these cases. I have reviewed each of the First Day Motions, including the exhibits thereto, and, as a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtor's executives, and discussions with the Debtor's outside advisors, I believe that the relief sought in each of the First

Day Motions is tailored to meet the goals described above, and ultimately will be critical to the Debtors' ability to achieve a successful reorganization.

## CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospects for an efficient and orderly liquidation will be substantially enhanced if this Court grants the relief requested in each of the First Day Motions.

Dated: May 2, 2011
Morristown, TN

*/s/ Keith Cooper*
Keith Cooper
CHIEF RESTRUCTURING OFFICER